IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02868-KAS

DIANA L. FARRAH,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,

      Defendant.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      This matter is before the Court on Defendant's **Partial Motion to Dismiss Plaintiff's Second Amended Complaint Under Fed. R. Civ. P. 12(b)(6)** [#35] (the "Motion"). Plaintiff filed a Response [#36] in opposition to the Motion [#35], Defendant filed a Reply [#37], and Plaintiff filed a Surreply [#38], with permission of the Court. *Minute Order* [#42] at 2. The Court has reviewed the briefs, the entire case file, and the applicable law. For the reasons stated below, the Motion [#35] is **GRANTED.**[1] Plaintiff's Second, Third, Fourth, Fifth, and Sixth Claims, as well as her FMLA retaliation claim, are **DISMISSED WITHOUT PREJUDICE**, but these claims for discrimination or retaliation are **DISMISSED WITH PREJUDICE** to the extent that they are based on any discrete act that predated January 21, 2022. Her First Claim (ADEA - Discrimination) can proceed but only

_____

[1] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#25, #26, #34].

as to Defendant's alleged failure to promote her to Grant Compliance Manager in March 2022.

## I. Background[2]

Plaintiff Diana Farrah, who proceeds as a pro se litigant,[3] brings this lawsuit to seek redress for alleged race and age discrimination, retaliation, and a hostile work environment, which she endured as a white employee, over the age of 40, while employed by Defendant City and County of Denver.

Plaintiff was 65 years old in March 2022. *See Second Am. Compl.* [#32] at 5. She worked for Defendant City and County of Denver from March 2013 until her resignation in October 2022, at which time she was a senior internal auditor. *Id.* at 7-8; *see also Charge of Discrimination* [#35-1] at 1.[4] She is a Certified Professional Accountant with 32

---

[2] For the purposes of resolving the Motion [#35], the Court accepts as true all well-pleaded, as opposed to conclusory, allegations made in Plaintiff's Second Amended Complaint [#32]. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, to the extent that Plaintiff provides additional allegations or possible new claims in her briefs, the Court notes that a party may not amend her complaint in motion briefing. *See, e.g.*, *Wilson v. Johnson*, No. 19-cv-2279-CMA-NRN, 2020 WL 5815915, at *5 (D. Colo. Sept. 30, 2020) (stating that it is "well established that [the] [p]laintiff may not amend his [c]omplaint by adding factual allegations in response to [the] [d]efendants' [m]otion to [d]ismiss").

[3] The Court must liberally construe a pro se litigant's filings. *See Haines v. Kerner*, 404 U.S. 519, 520-521 (1972). In doing so, the Court should neither be the pro se litigant's advocate nor "supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1175 (10th Cir. 1997) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). Further, pro se litigants are subject to the same procedural rules that govern other litigants. *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

[4] The Court may consider the Charge of Discrimination, which was attached to Defendant's Motion [#35], without converting the Motion into one for summary judgment because the Charge was incorporated by reference in Plaintiff's Second Amended Complaint [#32]. *See Second Am. Compl.* [#32] at 3 (referring to Charge of Discrimination attached to original Complaint [#1] at 35-36); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (stating that a court may consider documents attached to or incorporated by reference in a complaint when deciding a Rule 12(b)(6) motion to dismiss).

years of audit/compliance experience. *Id.* at 9, ¶ 1. Initially she worked for Defendant's Office of Economic Development Agency (OED), which was split into Housing Stability (HOST) and Denver Economic Development Opportunity (DEDO) around 2020. *Id.* at 8. After the split, Plaintiff worked for HOST. *Id.* Plaintiff claims that when HOST was created, "virtually all employees promoted or hired into management positions were young, inexperienced people" and that Defendant drove off or fired older workers. *Id.* at 12-13, ¶¶ 25, 31.

Plaintiff alleges that since 2013, she was expected to perform the work of two people. *Id.* at 15, ¶ 48. A "Position Justification – Application and Approval Form" was extended in May 2013 and posted in 2016, but no one was hired. *Id.*, ¶ 49. Earlier in her tenure, she believes she was "continuously denied opportunities for expansion in retaliation for using FMLA [Family Medical Leave Act] intermittently from 2016 to 2020 to care for her father." *Id.* at 8.

Around September 2020, Plaintiff was told by the former director, who is African American, that she would be allowed to work on FEMA grants, which were new to HOST and DEDO. *Id.* at 14, ¶ 43. Plaintiff believes this opportunity arose "due to [her] settlement of a grievance she filed in relation to her salary level and opportunities for development." *Id.* In early 2021, however, the former director informed Plaintiff that she would not be allowed to work on FEMA grants. *Id.* at 15, ¶ 45. Instead, a younger African American woman, Employee D, who is a "cousin of the Finance Director" and a niece of Former Mayor Webb, was allowed to work on them. *Id.* at ¶ 46; *see also id.* at 10, ¶ 6 (identifying Employee D). Plaintiff did not learn this until March 2023 when she received documents related to Colorado Civil Rights Division complaint. *Id.* at 15, ¶ 46. Between 2020 and

October 2023, "[v]irtually all young employees who had been hired at HOST" were promoted. *Id.*, ¶ 47.

Plaintiff alleges that she "never received less than satisfactory [ratings] with the exception of a needs improvement [rating] on one parameter approximately in 2015," and she "regularly received compliments for her respect toward co-workers." *Id.* at 12, ¶ 21; *see also id.* at 14, ¶ 39. In contrast, despite "critical feedback" from customer satisfaction surveys and agencies, Employee D "received overall satisfactory or above satisfactory [ratings] for the components in the performance evaluations." *Id.* at 13, ¶ 32. Despite not having prior lending experience, Employee D "was [eventually] promoted to a Fiscal Administrator I" position at DEDO. *Id.*, ¶ 34. In that position, Employee D received a detailed employee evaluation with an "Exceeds Expectation" rating from her manager, who is half African American and half Japanese. *Id.*, ¶ 35. Plaintiff alleges that DEDO "had a culture that was exceptionally favorable to non-whites and non-US citizens to the point that the Executive Director bragged about how many different languages from around the world the employees spoke." *Id.* at 14, ¶ 41.

In or around March 2022, Plaintiff applied and interviewed for HOST's Manager of Grants and Compliance. *Id.* at 5; *id.* at 16-17, ¶¶ 55-62 (describing Plaintiff's interview); *see also Charge of Discrimination* [#35-1] at 1. She alleges that HOST impaneled hostile interviewers, including a younger white male, "Employee E," whose hostility arose when Plaintiff previously attempted to train him. *Second Am. Compl.* [#32] at 16, ¶¶ 55-57. Even though Plaintiff met the job requirements, Employee D, a "younger and less experienced" individual, was hired. *Id.* at 9-10, ¶¶ 3, 6; *see also Charge of Discrimination* [#35-1] at 1. She claims that the whole process was a sham because HOST allegedly had already

decided whom it wanted to hire. *Second Am. Compl.* [#32] at 17, ¶¶ 64-66. Plaintiff alleges that HOST hired Employee D on March 31, 2023, but Plaintiff did not learn her application was declined until May 2023 and the reasons given were that she was impatient, struggled in relationships, and lacked soft skills. *Id.* at 18, ¶¶ 69, 70, 72, 73. Plaintiff avers that those reasons did not square with her 2014 through 2021 annual performance reviews, which were positive and did not contain any concerns about communications or people skills. *Id.* at 19-20, ¶¶ 75-81. Plaintiff believes that she was denied the promotion "based on [her] protected classes." *Charge of Discrimination* [#35-1] at 1. After Employee D's promotion, Plaintiff was "demoted to report to [her]," even though Plaintiff had previously reported directly to the Finance Director. *Second Am Compl.* [#32] at 10, ¶ 7; *see also Charge of Discrimination* [#35-1] at 2. Plaintiff claims that Defendant "was so desperate to promote African American applicants, that it overlooked red flags in the application of Employee D." *Second Am Compl.* [#32] at 11, ¶ 12.

Plaintiff also claims that Denver has a practice of "run[ning] off or tak[ing] adverse action against employees in the 60+ age range" and "regularly promot[ing] inexperienced employees over older workers with much more experience." *Id.* at 20, ¶ 83. As an example, Plaintiff claims that when she accidentally used a DEDO payroll code, Employee D "threatened to audit [her]" even though no one had previously threatened her over occasional coding mistakes. *Id.* at 20-21, ¶¶ 86-87. Employee D also "would try to take over" meetings with external auditors, even though Plaintiff was the point of contact. *Id.* at 21, ¶ 88.

Plaintiff claims that she and Employee E (the hostile male employee interviewer) were similarly situated—even though he was with DEDO and she was with HOST—

because he monitored the same grants Plaintiff had previously monitored for years, and he had been hired by the person who had supervised Plaintiff for a year before the OED split into DEDO and HOST. *Id.* at 23, ¶¶ 100, 101. Additionally, even after the split, DEDO's and HOST's operations overlapped. *Id.* at 23-24, ¶¶ 102-09. Plaintiff claims that she and Employee E "perform[ed] the exact same type of tasks for the very same group of [grant] subrecipients[.]" *Id.* at 25, ¶ 115. Employee E was 40 years old while Plaintiff was 64 years old when she filed her grievance. *Id.*, ¶ 117. Though Employee E had a master's degree in accounting, he had much less experience than Plaintiff. *Id.* at 26, ¶¶ 118-20. When Plaintiff's salary was evaluated (and increased from $78,085 to $83,317) in September 2020, Human Resources concluded that she had three times the experience of Defendant's other senior auditors in the mid-range of pay who performed grant subrecipient monitoring. *Id.*, ¶¶ 121-23.

Around March 2022, Employee E applied for and was promoted to DEDO's Director of Administration and Federal Compliance, a position for which Plaintiff did not apply "because she suspected that Employee E had disparaged her to management at DEDO such that she wouldn't even be considered for the position." *Id.* at 27, ¶¶ 126, 128. Plaintiff also claims that she did not apply for the position because the Chief Operating Officer was hostile to and drove away the finance manager who, like Plaintiff, was "an older employee." *Id.*, ¶ 130. Plaintiff asserts that Employee E "was not remotely qualified for the position of Director of Administration and Federal Compliance," *id.*, ¶ 132, and she believes that he was given more training opportunities than she received, *Charge of Discrimination* [#35-1] at 2 (alleging that she was "excluded from meetings, training

sessions, and career development opportunities that a similarly situated male coworker was allowed to attend").

Plaintiff next alleges that she received significantly more work than Employee E, and that the workload caused her to fall behind in her duties since 2017. *Id.* at 27-28, ¶¶ 133-34. Employee E was allegedly allowed to hire one additional staff member, which further reduced Employee E's workload, while her workload did not diminish. *Id.* at 29, ¶¶ 144, 146. The former director apparently expected Plaintiff to complete "some 80 fiscal monitorings involving multiple years and grants by December 2020; this expectation was physically impossible." *Id.* at 28, ¶ 138 (emphasis omitted). Plaintiff and a contract employee finished most of the monitorings by July 2021 and were "mostly caught up by December 2021." *Id.*, ¶ 139. She does not allege that she faced any reprimand or discipline for failing to complete the monitorings by December 2020.

Finally, Plaintiff alleges that her employee evaluations were discriminatory because DEDO's financial director gave Employee E high praise and "repeatedly lauded [him] for activities that [Plaintiff] did," but criticized Plaintiff's work as "very lacking." *Id*., ¶¶ 155-60.

Based on these allegations, Plaintiff asserts six claims: (1) violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., *Second Am. Compl.* [#32] ¶¶ 198-208; (2) retaliation in violation of the ADEA, *id.* ¶¶ 209-15; (3) "Race-Based Discrimination in Employment Decisions and Hostile Work Environment in Violation of the U.S. Constitution (Equal Protection Clause of the Fourteenth Amendment under §1983), Section 1981, Title VII, and CADA," i.e., the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401 et seq., *id.* ¶¶ 216-21; (4) "Race-Based Retaliation in Violation of the

U.S. Constitution (Equal Protection Clause of the Fourteenth Amendment under [42 U.S.C.] § 1983), [42 U.S.C. §] 1981, Title VII, and CADA," *id.* ¶¶ 222-25; (5) discrimination under Title VII of the Civil Rights Act and CADA based on sex and gender, *id.* ¶¶ 226-30; and (6) retaliation under Title VII and CADA based on sex and gender, *id.* ¶¶ 231-35. The Court also considers Plaintiff's claim that Defendant retaliated against her for taking FMLA leave to care for her father from 2016 to 2020, though she did not identify this claim as a numbered cause of action. *Id.* at 8.[5]

Defendant seeks dismissal of all claims except for Plaintiff's First Claim (ADEA Discrimination) based on its alleged failure to promote her to the Manager of Grant Compliance position. *See Motion* [#35] at 3.

## II. Standard of Review

Fed. R. Civ. P. 12(b)(6) permits dismissal of a claim where the plaintiff has "fail[ed] to state a claim upon which relief can be granted." The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "A complaint must contain 'enough facts to state a claim for relief that is plausible on its face.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While Plaintiff need not "establish a prima facie case" at the pleading stage, "the elements of each alleged cause of action help to determine whether [she] has set forth a plausible claim."

---

[5] Under a section titled "Other Claims for Relief," Plaintiff states: "Additional claims for relief as new causes of action were noted in motions related to the incorrectly named party; Plaintiff ran out of time to add this information." *Second Am. Compl.* [#32] at 41, ¶ 236. The Court does not consider any causes of action which are not actually included in the Second Amended Complaint [#32].

*Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). "When the complaint includes 'well-pleaded allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Carraway v. State Farm Fire & Cas. Co.*, No. 22-1370, 2023 WL 5374393, at *4 (10th Cir. Aug. 22, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

The Court need not accept as true allegations that are conclusory because they assert an inference "without 'stating underlying facts' or including 'any factual enhancement.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144-45 (10th Cir. 2023) (quoting *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)).

### III. Analysis

The Court will first address which of Plaintiff's allegations are conclusory (and therefore not entitled to the assumption of truth) and which are well-pleaded. *See, e.g.*, *Khalik*, 671 F.3d at 1193-94 (reviewing the plaintiff's complaint under Rule 12 after "[s]triking [her] conclusory allegations" and examining the remaining well-pleaded allegations). The Court will then address Defendant's timeliness arguments, which impact most (but not all) of Plaintiff's claims. After addressing the timeliness arguments, the Court will consider Plaintiff's six claims for relief.

### A.    Conclusory Allegations

A plethora of Plaintiff's allegations are conclusory because they are unsupported by facts. Exemplar allegations include:

- Defendant was "hostile" to white and older employees;

- "Virtually all young employees who had been hired at HOST while [Plaintiff] was employed were promoted between 2020 and October 2023";

- The Grant Compliance Manager hiring decision "had been made well before the position had been posted";

- One of the interviewers for the Grant Compliance Manager position "was also bigoted against older employees" and "had just succeeded in either terminating, 'managing out,' or running off an older employee prior to the interview";

- HOST/DEDO have a practice of "run[ning] off or tak[ing] adverse action against employees in the 60+ age range";

- "From the day [Plaintiff] started with [Denver], employees somewhat older than her were being driven off";

- Employee D "immediately started bullying [Plaintiff] to drive her from her job";

- Denver "retaliated against Plaintiff for engaging in protected activity by isolating her, accusing her of insubordination to set her up for termination, and demoting her";

- Plaintiff's "terms and conditions of employment were discriminatory compared to younger and African American employees";

- Denver had a practice of "driv[ing] off older employees by imposing impossible workload expectations";

- HOST "rejected at least 2 qualified candidates who applied for an Associate Auditor position, indicating its intention to continue to impose outlandish productivity requirements on [Plaintiff] to drive her from HOST";

- "Since May 2013, Defendant engaged in a pattern and practice of discriminating against individuals who are age 40 or older by knowingly and intentionally, through its employment practices, treating individuals who are 40 years of age or older adversely and treating individuals who are under the age of 40 preferentially";

- "Defendant engaged in unwarranted feedback, unwarranted accusations of insubordination, intense scrutiny of Plaintiff, disparate treatment of and isolation of Plaintiff";

- Denver "has a race-based policy for hiring with its efforts to hire anyone but white candidates if possible";

- Denver "evaluat[ed] black employees leniently"; and

- Plaintiff "was subject to disparate treatment compared to a similarly situated male".

*See, e.g.*, *Second Am. Compl.* [#32], ¶¶ 25, 47, 59, 64, 83, 84, 85, 90, 91, 148, 154, 201, 212, 213, 217, 221, 228.

The identified allegations fall into two categories: those that simply assert the elements of Plaintiff's claims and those that lack factual enhancement. The deficiencies in both categories render them implausible. *Cf. Matney*, 80 F.4th at 1144-45 (defining conclusory allegations as those "in which an inference is asserted without 'stating underlying facts' or including 'any factual enhancement'")

Omitting those conclusory allegations leaves the Court with the following factual allegations: (1) from 2013 to 2022, Plaintiff worked for Defendant performing a job that was intended for two people; (2) from 2014 on, Plaintiff regularly received positive feedback and reviews despite her very heavy workload; (3) Plaintiff took intermittent time off under FMLA from 2016 or 2017 to 2020; (4) OED split into HOST (Plaintiff's employing agency) and DEDO (Employee D's and Employee E's initial employing agency) sometime in 2020; (5) around September 2020, Plaintiff was told that she would be allowed to work on FEMA grants, though this work never materialized; (6) unlike other employees, Plaintiff's workload rendered her unable to participate in professional development activities; (7) around March 2022, Plaintiff applied for the Manager of Grants and Compliance but (8) the interviewing panel seemed disinterested in Plaintiff and promoted Employee D, a younger African American woman, instead; (9) Employee D was less qualified than Plaintiff for the position; (10) after Employee D was promoted, Plaintiff reported to her instead of to the Finance Director; (11) Employee D "threatened to audit" Plaintiff when she mistakenly used a DEDO payroll code once; (12) Employee D would

sometimes "hijack" meetings where Plaintiff was the point of contact; (13) Defendant conducts diversity, equity, and inclusion training for employees; (14) DEDO's Executive Director once "bragged about how many different languages from around the world the employees spoke"; (15) Employee E, a younger white male, applied for and was promoted to Director of Administration and Federal Compliance, even though he was not remotely qualified; (16) Plaintiff did not apply for that position because she believed Employee E had disparaged her to management; and (18) Plaintiff resigned on or about October 4, 2022. *Second Am. Compl.* [#32] at 5, 8; *id.*, ¶¶ 41, 43, 45, 48, 61, 69, 76, 86, 88, 126, 128, 132, 220; *Charge of Discrimination* [#35-1] at 1-2.

## B.   Timeliness

### 1.   Filing Periods

Plaintiff filed her Charge of Discrimination [#35-1] with the Colorado Civil Rights Division (the "CCRD") on November 17, 2022. *See Charge of Discrimination* [#35-1] at 2. Because Plaintiff first filed her charge with CCRD, under Title VII, ADEA, and CADA, only those acts that occurred 300 days before the November 17, 2022 charge filing date, or January 21, 2022, are actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (stating in Title VII context that "[a]ll prior discrete discriminatory acts" that fall outside the 300-day period preceding the charge filing date "are untimely filed and no longer actionable."); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1176 (10th Cir. 2011) (stating that compliance with ADEA's similar 300-day limitation period "is a condition precedent to bringing suit"); COLO. REV. STAT. § 24-34-403 (requiring charge's filing "within three hundred days after the alleged discriminatory or unfair employment practice occurred"). Here, any alleged discrete discriminatory or retaliatory acts that

occurred prior to January 21, 2022, are presumptively time-barred under Title VII, ADEA, and CADA.

For hostile work environment claims, the rule slightly differs. Because these claims involve "a series of separate acts that collectively constitute 'one unlawful employment practice[,]'" some component acts may have occurred outside of the timely filing period, provided that at least one "act contributing to the claim occurs within the filing period[.]" *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).

### 2.   Accrual and Equitable Tolling

Plaintiff indirectly asks the Court to toll or excuse any untimeliness because "she was unaware of certain situations that would have given rise to a complaint(s) until she received [Defendant's] documents provided during the [CCRD] investigation." *Response* [#36] at 3-4. She claims that Defendant deceived her by repeatedly telling her it was going to hire new staff and that she would have an opportunity to work on FEMA grants, but neither representation materialized. *Id*. There are two problems with Plaintiff's argument.

First, "a claim accrues when the disputed employment practice—the demotion, transfer, firing, refusal to hire, or the like—is first announced to the plaintiff." *Almond*, 665 F.3d at 1177 (citing *Del. State Coll. v. Ricks*, 449 U.S. 250 (1980)). Thus, an employee who learns of "the *injury* (the adverse employment decision) need not be aware of the unlawful *discriminatory intent* behind that act for the limitations clock to start ticking." *Id*. (emphasis in original). Here, Plaintiff may have learned more context behind Defendant's treatment of Employee D and Employee E through the CCRD process, but she did not learn of any new *injuries*. *See, e.g.*, *Charge of Discrimination* [#35-1] at 2 (asserting that "[t]hroughout [her] employment, [Plaintiff] was subjected to unequal terms and

conditions," including exclusion from meetings, training, and career development opportunities, and that her concerns were "ongoing and unremedied").

Second, Plaintiff has not shown that equitable tolling is warranted. Courts are not to disregard "[p]rocedural requirements established by Congress for gaining access to the federal courts . . . out of vague sympathy for particular litigants." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984); *see also Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014) (observing that "the [equitable tolling] doctrine effectively extends an otherwise discrete limitations period set by Congress" and, therefore, warrants careful consideration of statutory intent). Thus, courts will exercise their sound discretion to equitably toll deadlines only in rare circumstances, such as "where [the plaintiff] has actively pursued [her] judicial remedies by filing a defective pleading during the statutory period, or where the [plaintiff] has been induced or tricked by [her] adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990); *see also Arnold v. Air Midwest, Inc.*, 100 F.3d 857, 861 (10th Cir. 1996) (noting equitable tolling falls within the court's sound discretion).

Here, Plaintiff has not shown that she was "actively misled, or has in some extraordinary way been prevented from asserting . . . her rights[.]" *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002) (internal citation and quotation marks omitted). Even if Defendant misled Plaintiff into thinking it would hire more employees from 2014 onward or that it would allow her to work on FEMA grants in 2020, *see Second Am. Compl.* [#32] ¶¶ 143, 52, Plaintiff does not explain how these acts caused her to wait until November 2022 to file a Charge of Discrimination. In its discretion, the Court finds that equitable tolling is unwarranted.

Upon review of Plaintiff's Second Amended Complaint [#32] and her Charge of Discrimination [#35-1], the Court identifies four discrete employment incidents that allegedly occurred during the relevant filing period: (1) in March 2022, she applied for the Grant Compliance Manager position but learned two months later that Denver had hired a younger black woman, Employee D; (2) after Employee D's promotion, Plaintiff began reporting to her rather than to the Finance Director; (3) around March 2022, a younger white male employee, Employee E, applied for and was promoted to Director of Administration and Federal Compliance, a position for which Plaintiff did not apply; (4) Plaintiff resigned in October 2022, which she frames as a "constructive discharge". *See Charge of Discrimination* [#35-1] at 1-2. Any discrete incidents predating January 2022—e.g., Plaintiff's high workload from 2013 to January 20, 2022; Defendant's failure to hire another employee from 2014 onward; Defendant's failure to allocate FEMA grant work to Plaintiff in 2020; and Defendant's failure to make professional development activities available to Plaintiff from 2013 to January 20, 2022—are time-barred and cannot support a discrimination or retaliation claim, though these events could potentially be cognizable as part of a hostile work environment claim if they persisted into the 300-day filing period. *See Morgan*, 536 U.S. at 117.

## C.   Discrimination Claims

### 1.   First Claim (ADEA)

The ADEA renders unlawful adverse actions taken against an employee because of that employee's age. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 170 (2009) (citing 29 U.S.C. § 623(a)). The elements of an ADEA discrimination claim are: (1) "[the plaintiff] is a member of the class protected by the [ADEA]," i.e., that she was over 40

years old; (2) "she suffered an adverse employment action"; (3) "she was qualified for the position at issue"; and (4) "she was treated less favorably than others not in the protected class." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010) (citation omitted). Notably, however, "a plaintiff need not establish a prima facie case of discrimination (or but-for causation) at the pleading stage." *Scribner v. Durango Coca-Cola Bottling Co.*, No. 23-cv-01263-NYW-KAS, 2023 WL 7003492, at *4 (D. Colo. Oct. 24, 2023) (citing *Khalik*, 671 F.3d at 1192) (other citations omitted).

### a.    Grant Compliance Manager Position

The Court first addresses Plaintiff's unsuccessful application for Grant Compliance Manager, which position was given to a younger black woman, Employee D. Defendants acknowledge—and the Court agrees—that Plaintiff has pleaded sufficient facts regarding its alleged failure to promote her to Manager of Grant Compliance to survive dismissal. *See Motion* [#35] at 3. Therefore, this part of Plaintiff's ADEA claim will be allowed to proceed to discovery.

### b.    Changed Reporting Structure

Secondly, the Court addresses Plaintiff's allegation that, following Employee D's promotion to Grant Compliance Manager, Plaintiff had to report to Employee D rather than to the Finance Director.

To allege an "adverse employment action," a plaintiff must plausibly allege that "the [action] brought about some 'disadvantageous' change in an employment term or condition." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The harm need not be

significant, but the harm must concern "an identifiable term or condition of employment." *Id.* at 354-55.[6]

Here, Plaintiff frames her change in supervisor from the Finance Director to the newly promoted Manager of Grant Compliance Employee D as a demotion, separate and apart from Defendant's alleged failure to promote her to that position. However, she does not explain how this change in reporting constituted a demotion or otherwise caused some harm. *See, e.g., Ellis v. Salt Lake City Corp.*, 553 F. Supp. 3d 990, 999 (D. Utah 2021) (finding that plaintiff had plausibly alleged discriminatory demotion where she alleged that "she was adversely affected by the demotion because she lost rank and her pay was reduced"); *Gomez v. Okmulgee Cnty. Crim. Just. Auth.*, No. 6:22-cv-00322-RAW-DES, 2023 WL 4999861, at *3 (E.D. Okla. Aug. 4, 2023) (finding that plaintiff had plausibly stated an "adverse employment action" by alleging that the defendant had demoted him by reducing his pay); *see also Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 799 (10th Cir. 1993) (stating that "a reassignment is not a demotion unless the employee can show that [she] receives less pay, has less responsibility, or is

---

[6] *Muldrow* abrogated prior case law, including from the Tenth Circuit, which required an employment discrimination plaintiff to allege "significant" or "material" harm as part of the "adverse employment action" element. *Cf. Muldrow*, 601 U.S. at 353 n.1 (abrogating *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)), 355-56 (disapproving of *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012)). This represented a sea change in what constitutes an "adverse employment action" in this Circuit. *See, e.g., Staton v. DeJoy*, No. 23-cv-03223-SBP, 2025 WL 42821, at *8 (D. Colo. Jan. 7, 2025) (stating that post-*Muldrow*, adverse employment action "appears to this court to encompass a significantly broader category of actions entitled to be called 'adverse' than previously countenanced by the Tenth Circuit," but noting that the Tenth Circuit has not yet offered guidance on "the application of *Muldrow*'s 'some harm' standard"). However, *Muldrow* plainly requires a plaintiff to allege *some* specific harm. *Muldrow*, 601 U.S. at 354-55 ("To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment."); *see also, e.g., Smith v. McDonough*, No. 20-1321 KK/JFR, 2024 WL 2804428, at *9-10 (D.N.M. May 31, 2024) (district court reviewing its prior order in light of *Muldrow* but finding summary judgment for employer was still warranted where "the challenged conduct is so mild and isolated, a reasonable juror could not conclude that it altered the conditions of [the p]laintiff's employment").

required to utilize a lesser degree of skill than [her] previous assignment"), *abrogated on other grounds by Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995).

Plaintiff alleges that Employee D once "threatened to audit [her] time-cards when [she] mistakenly used a DEDO payroll code" and would sometimes try to take over meetings where Plaintiff was the point of contact. *See Second Am. Compl.* [#32] at 20-21, ¶¶ 86-88. Even if these incidents occurred, Plaintiff does not explain how they constituted "harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 354-55. She does not allege that she faced any repercussion or reprimand for the time-card error, and she does not explain how her new manager's attempt to command certain meetings impacted her ability to perform her job. "Drama sometimes festers at work. And the court has no role in sorting out garden-variety workplace disputes." *Pearson v. Kan. Dep't of Corr.*, No. 23-2288-DDC, 2024 WL 4948884, at *1 (D. Kan. Dec. 3, 2024). As noted in *Ellis*, *Gomez*, and *Hooks*, demotion claims typically require the plaintiff to allege that she either lost rank, pay, or responsibility, but Plaintiff makes no such allegations, and she does not otherwise allege at least some harm.[7] Plaintiff's alleged demotion cannot support an age discrimination claim. Therefore, this part of Plaintiff's ADEA claim will not be allowed to proceed to discovery. The Court grants Defendant's Motion [#35] to the extent it seeks dismissal of this aspect of Plaintiff's ADEA claim.

---

[7] As Defendant argues, Plaintiff adds new factual details in her Response [#36], namely that she was "not allowed to participate in an agency-wide discussion about internal controls" and that she was "removed from a committee," but the Court cannot consider these allegations because Plaintiff cannot amend her operative complaint in response to a motion to dismiss. *See Reply* [#37] at 8-9 (citing *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004) ("The plaintiffs may not effectively amend their [c]omplaint by alleging new facts in their response to a motion to dismiss.")).

### c.  Director of Administration and Federal Compliance Position

Thirdly, the Court addresses Plaintiff's allegation that a younger white male employee, Employee E, was promoted to Director of Administration and Federal Compliance—a position for which Plaintiff did not apply. Plaintiff's failure to apply is fatal to this aspect of her ADEA claim. *See Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003) (stating that a failure-to-promote claim requires that the plaintiff "applied for and was qualified for the position") (citation omitted); *cf. Evans v. Fed. Express Corp.*, 76 F. App'x 263, 265-66 (10th Cir. 2003) (finding a failure to establish a prima facie failure-to-promote claim where the promotion was not actually a promotion and the plaintiff did not apply for the position).

Plaintiff attempts to invoke the futile gesture doctrine. *See Second Am. Compl.* [#32] at 27 ¶ 128 ("[Plaintiff] did not apply . . . because she suspected that Employee E had disparaged her"), 40 ¶ 229 ("The disparate treatment led Plaintiff to conclude that she would never be considered for a promotion to Director of Administration and Federal Compliance"). "A plaintiff alleging discrimination need not show [s]he applied for a job or promotion and was rejected if doing so would have been futile." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 629 (10th Cir. 2012), *disapproved of on other grounds in Muldrow*, 601 U.S. at 355-56 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977)). The futile gesture doctrine "applies in cases where the employer has a 'consistently enforced discriminatory policy' that will deter applicants who are aware of the policy from applying because they know they face 'certain rejection.'" *Daniels*, 701 F.3d at 629 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 365. A nonapplicant plaintiff must plausibly allege that she "would have applied but for accurate knowledge of an employer's

discrimination and that [s]he would have been discriminatorily rejected had [s]he actually applied." *Id.* (quoting *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1227-28 (10th Cir. 2001), *abrogated in part on other grounds as explained in Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003)).

Here, Plaintiff has not plausibly alleged a consistently enforced discriminatory policy that would excuse her from applying. Her "subjective belief" as to futility is insufficient. *Cf. Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999) (noting inadequacy of mere subjective belief to invoke the futile gesture doctrine in context of an Americans with Disabilities Act employment claim). Plaintiff's allegations concerning futility have nothing to do with age discrimination. First, she refers to the personal hostility between herself and Employee E, which had apparently existed for years. *See Second Am. Compl.* [#32] at 27, ¶ 128 (concerning "suspected" disparagement by Employee E); *id.* at 31, ¶ 164 (concerning personal hostility between Plaintiff and Employee E from when she trained him). Second, Plaintiff claims that Employee E was promoted because he had more training and managerial experience than she had. *Id.* at 33, ¶ 178 (concerning Employee E's supervisory experience); *Charge of Discrimination* [#35-1] at 2 (alleging that Employee E was promoted "in part because he was afforded training and other opportunities"). As pleaded, Defendant's promotion of Employee E cannot support an age discrimination claim. Therefore, this part of Plaintiff's ADEA claim will not be allowed to proceed to discovery. The Court grants Defendant's Motion [#35] to the extent it seeks dismissal of this aspect of Plaintiff's ADEA claim.

### d.   Constructive Discharge

Finally, the Court addresses Plaintiff claims that she was constructively discharged on October 4, 2022, because she "felt that [she] had no other reasonable option but to submit [her] resignation." *Charge of Discrimination* [#35-1] at 2.

Plaintiff alleges no details about how her work responsibilities, pay, or rank changed between March 2022 (when Defendant did not promote her to Grant Compliance Manager) and October 2022. The test for constructive discharge is objective, not subjective. *Cf. Romero v. Helmerich & Payne Int'l Drilling Co.*, 768 F. App'x 838, 842 (10th Cir. 2019) (stating that to prevail on a constructive discharge claim, Colorado law requires a plaintiff to show objectively intolerable working conditions and resignation as a result); *Yearous v. Niobrara Cnty. Mem'l Hosp. ex rel. Bd. of Trs.*, 128 F.3d 1351, 1356 (10th Cir. 1997) ("A plaintiff's subjective views of the situation are irrelevant.") (citations omitted). "The bar is quite high in such cases: the plaintiff must show that [s]he had no other choice but to quit." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (citation omitted) (finding that "an extended period of [supervisors'] intimidating behavior," which diminished the plaintiff's job performance, and "repeated denials of his requests to transfer" were insufficient to "raise an inference that he was left with no choice but to resign when he did").

Plaintiff's assertion that she was constructively discharged or forced to resign is entirely conclusory. She offers no details about how her work conditions became so intolerable that she had to resign in October 2022. On the contrary, she plainly attributes her resignation decision to concerns that existed "[t]hroughout [her] employment" such as exclusion from meetings, training sessions, and career development opportunities and

heavy workload. *See Charge of Discrimination* [#35-1] at 2 (stating that Plaintiff resigned "due to the ongoing and unremedied discriminatory treatment in the workplace"). To the extent these conditions had persisted for years, Plaintiff does not explain why she was compelled to resign in October 2022. As pleaded, Plaintiff's alleged constructive discharge cannot support an age discrimination claim. Therefore, this part of Plaintiff's ADEA claim will not be allowed to proceed to discovery. The Court grants Defendant's Motion [#35] to the extent it seeks dismissal of this aspect of Plaintiff's ADEA claim.

In summary, Plaintiff's First Claim is **dismissed without prejudice** to the extent she claims age discrimination based on (1) the "demotion" that resulted from the change in reporting structure after Employee D' promotion; (2) Employee E's promotion to Director of Administration and Federal Compliance, for which Plaintiff did not apply; or (3) her resignation in October 2022, which she frames as a "constructive discharge". *See, e.g.*, *Gee v. Pacheco*, 627 F.3d at 1186 (stating that "ordinarily the dismissal of a pro se claim under Rule 12(b)(6) should be without prejudice"). Plaintiff's First Claim is **dismissed with prejudice** to the extent she claims age discrimination based on any discrete acts that predated January 21, 2022. *See*, *e.g. AdvantEdge Bus. Grp. v. Thomas E. Mestmaker & Assocs., Inc.*, 552 F.3d 1233, 1236 (10th Cir. 2009) (recognizing that "a dismissal with prejudice can have the practical effect of a dismissal with prejudice" if a claim is time-barred"). Plaintiff's First Claim may proceed only to the extent it is premised on Defendant's failure to promote her to the Manager of Grant Compliance position.

2.      **Third Claim (Race Discrimination - Title VII, 42 U.S.C. § 1981, CADA, and the Equal Protection Clause)**[8]

"Title VII and Section 1981 prohibit employers from discriminating against an employee on the basis of race. For discrimination claims based on disparate treatment, [a] plaintiff must establish that she was treated differently because of race and that she suffered adverse employment action." *Wilson v. Mercury Mgmt., LLC*, No. 23-2245-KHV, 2023 WL 6961987, at *3 (D. Kan. Oct. 20, 2023) (citing *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007)). "In addition, Section 1981 discrimination claims require that [a] plaintiff allege that [the] defendant had the intent to discriminate on the basis of race." *Id.* (citing *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101-02 (10th Cir. 2001)). Likewise, "[t]o state an equal protection claim against a municipality in the employment context, the plaintiff must show that the defendant's conduct, taken under color of law: (i) constitutes an adverse employment action; (ii) was motivated by a discriminatory intent; and (iii) was pursuant to the defendant's policy or custom." *Hunt v. Cent. Consol. Sch. Dist.*, 951 Supp. 2d 1136, 1186 (D.N.M. 2013) (internal quotation marks omitted).

"Where a plaintiff brings a 'reverse discrimination' claim, [s]he 'must, in lieu of showing that [s]he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who

---

[8] Legal standards under CADA, 42 U.S.C. § 1981, and the Equal Protection Clause mirror those of Title VII. *See Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003) ("Colorado has adopted the same standards applicable to Title VII cases when considering claims brought under [CADA].") (citing *Colo. Civ. Rts. Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400-01 (Colo. 1997)); *see also Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (stating that "the standards are the same" to prove violations of Title VII or 42 U.S.C. § 1981); *Hunt v. Cent. Consol. Sch. Dist.*, 951 F. Supp. 2d 1136, 1187-88 (D.N.M. 2013) (collecting published circuit court cases that applied Title VII standards to Equal Protection discrimination claims brought under § 1983).

discriminates against the majority.'" *Smith v. McDonough*, No. 22-6131, 2023 WL 2765898, at *4 (10th Cir. Apr. 4, 2023) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1201 (10th Cir. 2006)) (additional citation omitted). "Alternatively, a plaintiff may produce facts 'sufficient to support a reasonable inference that but for [the] plaintiff's status the challenged decision would not have occurred.'" *Smith*, 2023 WL 2765898, at *4 (quoting *Argo*, 452 F.3d at 1201) (additional citation omitted).

Here, Plaintiff does not allege any facts that create an inference that Defendant is one of those rare employers who discriminates against white employees. As previously noted, Defendant's failure to promote Plaintiff to the Manager of Grant Compliance position is the only plausibly alleged adverse employment action. However, Plaintiff admits that during the same timeframe when Denver promoted Employee D, it also promoted a white employee—Employee E—to a director position. *See Second Am. Compl.* [#32] at 27, ¶ 126 ("Employee E applied for and was promoted to Director of Administration and Federal Compliance in DEDO around March 2022."). As a result, Plaintiff has not plausibly alleged that, but for her race, she would have been promoted. *See, e.g.*, *Amarsingh v. Frontier Airlines, Inc.*, No. 23-cv-01875-GPG-KAS, 2024 WL 4523868, at *5 (D. Colo. Sept. 24, 2024), *appeal filed*, No. 24-1391 (10th Cir. Oct. 8, 2024) (finding plaintiff's allegation that an African American man was also bumped from her flight was fatal to her § 1981 theory that airline's gate agents "were motivated by racial discrimination in favor of African Americans" because "[i]f race were truly the deciding factor, [the defendant's] agents would have seated the African American").

Plaintiff has not plausibly alleged that Defendant is one of those unusual employers who racially discriminates against the majority, in part because she alleges that a white

employee, Employee E, received a promotion. "[T]here is nothing other than sheer speculation to link [Defendant D's promotion] to a discriminatory or retaliatory motive." *Khalik*, 671 F.3d at 1194; *see also French v. Denver Pub. Schs.*, No. 23-cv-01614-NYW-MDB, 2024 WL 3276159, at *17 (D. Colo. July 2, 2024) ("Fatal to [the plaintiff's] claim, however, is the lack of any circumstances to suggest that this bias was [race]-based."). Plaintiff's Third Claim is **dismissed without prejudice** for failure to state a claim. *See, e.g.*, *Gee*, 627 F.3d at 1186. Plaintiff's Third Claim is **dismissed with prejudice** to the extent she claims race discrimination based on any discrete acts that predated January 21, 2022. *See*, *e.g. AdvantEdge Bus. Grp.*, 552 F.3d at 1236.

### 3. Fifth Claim (Sex/Gender Discrimination – Title VII, CADA)

Similarly, Plaintiff's sex/gender discrimination claim fails because she has not plausibly alleged an adverse employment action that could possibly have "occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000)). As previously discussed, Plaintiff has plausibly identified just one potentially actionable adverse employment action: Defendant's promotion of Defendant D to the Manager of Grant Compliance position. However, Plaintiff admits that several supervisors at HOST and DEDO were women while she was employed there, and the person who was promoted instead of Plaintiff was also a woman. *See, e.g.*, *Second Am. Compl.* [#32] at 13, ¶ 35 (identifying Employee D's manager in 2021 as a female); *Charge of Discrimination* [#35-1] at 1 (identifying Employee D as a female; *id.* at 2 (identifying Director of the Financial Management Unit as a female).

Here, Plaintiff has alleged no facts tending to show that she was discriminated against based on her sex or gender or that the workplace was permeated by discriminatory treatment towards women or towards Plaintiff because she is a woman. "[T]here is nothing other than sheer speculation to link [Defendant D's promotion] to a discriminatory or retaliatory motive." *Khalik*, 671 F.3d at 1194; *see also French*, 2024 WL 3276159, at *17 ("Fatal to [the plaintiff's] claim, however, is the lack of any circumstances to suggest that this bias was sex-based."). Therefore, Plaintiff's Fifth Claim is **dismissed without prejudice** for failure to state a claim. *See, e.g.*, *Gee*, 627 F.3d at 1186. Plaintiff's Fifth Claim is **dismissed with prejudice** to the extent she claims sex/gender discrimination based on any discrete acts that predated January 21, 2022. *See, e.g. AdvantEdge Bus. Grp.*, 552 F.3d at 1236.

**D.   Retaliation Claims (Second, Fourth, and Sixth Claims)**

**1.   Retaliation under ADEA, Title VII, 42 U.S.C. § 1981, CADA, and the Equal Protection Clause**

Plaintiff's Second, Fourth, and Sixth Claims allege that Defendant retaliated against her in violation of the ADEA, Title VII, 42 U.S.C. § 1981, CADA, and the Equal Protection Clause. *See Second Am. Compl.* [#32], ¶¶ 209-15, 222-25, 231-35.

At the outset, the Court addresses Plaintiff's claim that Defendant engaged in race-based retaliation in violation of the Equal Protection clause. *See Second Am. Compl.* [#32] at 32, ¶¶ 222-225 (Claim Four). In support, Plaintiff alleges that she "engaged in protected activity when she filed a race discrimination complaint" and "Defendant retaliated by engag[ing] in unwarranted feedback, unwarranted accusations of insubordination," and through other measures. *Id.*, ¶¶ 223-224. Because Plaintiff's retaliation-based Equal Protection claim is premised on alleged retaliation in response to

protected activity, Claim Four is non-viable, and **dismissal is warranted**. *See*, *e.g.*, *Teigen v. Renfrow*, 511 F.3d 1072, 1086 (10th Cir. 2007) (holding that a retaliation claim arising from protected conduct concerning an employer's unlawful employment policies "cannot form the basis for a constitutional equal protection violation."); *Sims v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 120 F. Supp. 2d 938, 959 (D. Kan. 2000) (noting that "no court has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination") (collecting circuit court decisions).

As for Plaintiff's remaining retaliation claims, the Court discusses them together because they share the same elements. *See Lindsay v. Denver Pub. Schs.*, 88 F.4th 1323, 1327 (10th Cir. 2023) (noting similarity of elements among retaliation claims under § 1981, Title VII, and the Colorado Anti-Discrimination Act); *Weathersby v. Latshaw Drilling Co., LLC*, No. 24-CV-03638-CVE-CDL, 2024 WL 4896604, at *7 (N.D. Okla. Nov. 26, 2024) (noting that retaliation claims under Title VII, § 1981, and the ADEA are governed by the same standards). Each of the statutes on which Plaintiff's retaliation claims rests "prohibits an employer from discriminating against an employee for engaging in a protected activity." *Weathersby*, 2024 WL 4896604, at *7. Under these statutes, a plaintiff must plausibly allege that "(1) he or she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008) (citation omitted); *see also Weathersby*, 2024 WL 4896604, at *7. Additionally, while retaliation claims under these statutes share the same

elements, they "do not share the same causal standards." *Weathersby*, 2024 WL 4896604, at *7 n.13 (noting that "but-for" causation standard applies to Title VII, § 1981, and ADEA claims); *see also Lindsay*, 88 F.4th at 1237 (acknowledging "subtle analytical variations" among each statute's causation standard). However, because Plaintiff has not plausibly alleged *any* causal connection between a protected activity and an adverse employment action, the court need not consider her retaliation claims under the different causation standards. *See Weathersby*, 2024 WL 4896604, at *7 n.13.

In the context of these retaliation claims, "materially adverse" means that "it might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted). While the Supreme Court's *Muldrow* decision modified the "adverse employment action" standard for a discrimination claim, the Supreme Court expressly left intact *White*'s "materially adverse" requirement for retaliation claims. *See Muldrow*, 601 U.S. at 357 ("*White* adopted the [material adversity] standard for reasons peculiar to the retaliation context.").

Here, Plaintiff alleges that she "was retaliated against for filing a complaint related to . . . Employee D's promotion" on or around June 15, 2022. *Second Am. Compl.* [#32] at 6; *Charge of Discrimination* [#35-1] at 2. However, she does not allege (and did not charge) any specific adverse employment actions that occurred after that date. Instead, Plaintiff makes conclusory assertions that (1) she was "isolated, denied opportunities to participate in meetings that were relevant to her position," (2) she was forced to report to Employee D after Employee D's promotion, (3) she was "accused of insubordination" and

"not doing her job for 2 years," (4) the Finance Director and Manager of Grants and Compliance sought to make her job "more difficult and time-consuming" by forcing her to use audit worksheets, and (5) the Finance Director prevented her from explaining what federal funds monitoring she conducted or from discussing an auditor's findings. *Second Am. Compl.* [#32] at 6-7. Additionally, she points to alleged continued retaliation by her former coworkers even though she no longer works with them. *See Second Am. Compl.* [#32] at 7. However, any alleged post-employment retaliation cannot logically constitute an employment action whether materially adverse or not.

The test for material adversity is objective, not subjective. *Cf. White*, 548 U.S. at 68, 69 (requiring plaintiffs to "show that a reasonable employee would have found the challenged action materially adverse"). Without further factual enhancement, the Court cannot reasonably infer that these actions, either individually or collectively, rose to the level of a "materially adverse" employment action necessary to state a retaliation claim under ADEA, Title VII, § 1981, or CADA. "Context matters." *White*, 548 U.S. at 69 (comparing and contrasting situations, which based on a given context, could be materially adverse, but may not be in another context).

These statutes are meant to "prohibit[] employer actions that are likely to deter victims of discrimination from complaining to the EEOC, courts, or their employers," and "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *White*, 548 U.S. at 68 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)) (internal quotation marks omitted); *see also id.* (stating that "personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable) (quoting 1 B. LINDEMANN & P. GROSSMAN, EMPLOYMENT

DISCRIMINATION LAW 669 (3d ed. 1996)). Plaintiff has failed to allege that she suffered any materially adverse action after she filed her discrimination complaint based on a younger Black employee's (Employee D's) promotion.

In sum, Plaintiff has not plausibly pleaded a claim for retaliation under the ADEA, Title VII, § 1981, or CADA. Her Second, Fourth, and Sixth Claims are therefore **dismissed without prejudice**. *See, e.g.*, *Gee*, 627 F.3d at 1186. These claims are **dismissed with prejudice** to the extent she claims retaliation based on any discrete acts that predated January 21, 2022. *See*, *e.g. AdvantEdge Bus. Grp.*, 552 F.3d at 1236.

### 2.    FMLA Retaliation

Plaintiff briefly alleges that Defendant "retaliated against [her] for using intermittent FMLA from 2017 to 2020 to care for her father" in the form of "lack of career development compared to . . . Employee D and Employee E[.]" *Second Am. Compl.* [#32] at 8; *see also id.* at 3. Defendant argues that this claim is barred by FMLA's general two-year statute of limitations and that she has not shown that the three-year limitations period for "willful" violations is applicable. *See Motion* [#35] at 15 (arguing that "Plaintiff alleges she took FMLA leave in 2020, so at the latest, her claim would have expired on December 31, 2022—nine months prior to Plaintiff's filing of her initial complaint"). This is incorrect because an FMLA retaliation claim can accrue after an employee returns to work. *See*, *e.g.*, *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287-88 (10th Cir. 2007) (stating that "a retaliation claim may be brought when the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work") (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1136-38 (10th Cir. 2003) (analyzing an FMLA

claim presented in retaliation context, where claim arose from termination for alleged attendance problems after her return from FMLA)); *see also* 29 U.S.C. § 2617(c)(1) (directing that, in absence of willful conduct, FMLA claim must be brought within two years of "the last event constituting the alleged violation").

Plaintiff's FMLA allegations are so threadbare that the Court cannot determine when they accrued, so they cannot be dismissed based on the affirmative defense of statute of limitations. However, as with her other retaliation claims, they are subject to dismissal for failure to state a claim.

The elements of a prima facie FMLA retaliation claim are the same as the elements for retaliation under ADEA, Title VII, § 1981, and CADA. *Compare Hinds*, 523 F.3d at 1202 and *Lindsay*, 88 F.4th at 1327 *with Campbell*, 478 F.3d at 1287. Here, Plaintiff offers no factual allegations about what specific adverse actions Defendant allegedly took in retaliation for her using FMLA leave from 2017 to 2020. *See Second Am. Compl.* [#32] at 8. She gestures at a "lack of career development" but she does not identify any specific "action that a reasonable employee would have found materially adverse," such as termination, demotion, transfer, or reprimand. *Campbell*, 478 F.3d at 1287 (quotation omitted).

Plaintiff also fails to causally connect her "lack of career development" to her taking FMLA leave. Specifically, elsewhere in her Complaint [#32] and Charge of Discrimination [#35-1], she attributes her lack of career development to workload, racial discrimination, age discrimination, and sex discrimination. *See, e.g.*, *Charge of Discrimination* [#35-1] at 2 (claiming that throughout her career, Plaintiff was "excluded from meetings, training sessions, and career development opportunities that a similarly situated male coworker

was allowed to attend"); *Second Am. Compl.* [#32] at 14, ¶ 40 ("[The former director] and [the Finance Director] simply decided that [Plaintiff] was not to be recognized for the same activities that Employee D did. [Plaintiff] was not to be given developmental or advancement opportunities."); *id.* at 15, ¶ 48 (alleging that Plaintiff was denied developmental opportunities in part "because of [her] discriminatory workload"). Plaintiff's own pleading undermines her suggestion that her lack of career development was causally connected to her taking FMLA leave.

To the extent Plaintiff attempts to allege FMLA retaliation, that claim is **dismissed without prejudice** for failure to state a claim. *See, e.g.*, *Gee*, 627 F.3d at 1186.

### E.   Hostile Work Environment (Third Claim)

In her third claim, Plaintiff lodges a claim for age- and race-based hostile work environment under the Equal Protection clause, § 1981, Title VII, and CADA, in addition to the already discussed race discrimination claim. She alleges that "[t]he hostile work environment was caused by the Chief Executive Office of DEDO bragging about how diverse DEDO was and how so many different languages are spoken by the employees at DEDO." *Second Am. Compl.* [#32] at 38, ¶ 218. She further alleges that the hostile work environment "was caused by 2 black directors in HOST, who would be very friendly when talking with black co-workers while ignoring white staff" and by a multi-day seminar that HOST and DEDO presented and during which "black employees made it clear how much they resented and disliked white employees, making comments like, 'every day is a battle.'" *Id*. ¶¶ 219, 220; *see also id*. ¶¶ 28-31 (alleging that "the working environment was hostile to older and white employees").

At the outset, the Court again notes that the substantive analyses for race- and age-based hostile work environment claims under the Equal Protection clause, § 1981, Title VII, and CADA[9] are identical. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (concerning § 1981 and Title VII); *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003) (concerning Title VII and CADA); *Weathersby*, 2024 WL 4896604, at *7 (concerning Title VII, § 1981, and ADEA); *Nieto v. Kapoor*, 182 F. Supp. 2d 1114, 1140 (D.N.M. 2000) (concerning the Equal Protection Clause and Title VII).

To state an actionable race- or age-based hostile work environment claim, "a plaintiff must allege: (1) membership in a protected class; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was due to race [or age]; and (4) the harassment was so severe or pervasive that it altered a term, condition, or privilege of [her] employment and created an abusive environment." *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1249 (10th Cir. 2024) (citing *Lounds*, 812 F.3d at 1222).

"Whether an environment is hostile or abusive can be determined only by looking at all the circumstances including the frequency of the discriminatory conduct; its severity;

---

[9] At the time of the alleged conduct that created a hostile work environment, *i.e.*, sometime before Plaintiff's October 2022 resignation, CADA hostile work environment claims required the same substantive analysis as claims under Title VII and the like. However, in 2023, CADA was amended to depart from Title VII's "severe and pervasive" standard in three circumstances: (1) "[s]ubmission to the conduct or communication is explicitly or implicitly made a term or condition of" employment; (2) "[s]ubmission to, objection to, or rejection of the conduct or communication is used as a basis for employment decisions affecting the individual"; or (3) "[t]he conduct or communication has the purpose or effect of unreasonably interfering with the individual's work performance or creating an intimidating, hostile, or offensive working environment." *See* COLO. REV. STAT. § 24-34-402(1.3)(a)(I)-(III); *see also Peterson v. City of Aurora*, No. 24CA0067, 2025 WL 415486, at *2 (Colo. App. Feb. 6, 2025) (noting recent change in the law). Because these amendments were intended to be prospective, and the alleged conduct occurred *before* the amendments, the Court adheres to CADA's previous definition of "hostile environment." *See Peterson*, 2025 WL 415486, at *2 (noting prospective nature of amendments and upholding jury instructions premised on CADA's pre-amendment definition of "hostile work environment") (citing 2023 Colo. Sess. Laws 2323, 2335-36).

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Stinnett*, 337 F.3d at 1219 (internal quotation marks and citation omitted); *see also* COLO. REV. STAT. § 24-34-402(1.3)(c)(II)(A)-(I) (identifying factors such as frequency and duration of the conduct, the number of individuals engaged in the conduct or communication, the threatening nature, a power differential between the alleged harasser and the alleged victim, use of epithets or slurs, and whether the conduct or communication reflects stereotypes about a protected class) (added in 2023, *see* 2023 Colo. Sess. Laws 2328).

For harassment to rise to the level where it "alter[s] the terms, conditions, or privileges of employment, the complained-of conduct must be both objectively and subjectively offensive." *Young*, 94 F.4th at 1250 (citing *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Thus, in addition to plausibly alleging that she subjectively perceived the employer's conduct as severe or pervasive, a plaintiff must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Young*, 94 F.4th at 1251; *see also* COLO. REV. STAT. § 24-34-402(1.3)(a) (describing conduct or communication that is "subjectively offensive to the individual alleging harassment and is objectively offensive to a reasonable individual who is a member of the same protected class"). "[A] single event, if extraordinarily severe, can alter the conditions of a working environment." *Young*, 94 F.4th at 1250; *see also* COLO. REV. STAT. § 24-34-402(1.3)(c)(II)(A) ("a single incident may rise to the level of harassment") (added in 2023, *see* 2023 Colo. Sess. Laws 2328).

Here, even if the Court assumes that Plaintiff has satisfied the first and third elements, i.e. that she was a member of a protected class and that any harassment was due to race or age, her Second Amended Complaint [#32] does not show that any harassment was sufficiently severe or pervasive as to create a hostile work environment. Her allegations are like those in *Young*, where the plaintiff alleged a hostile work environment claim based on the Colorado Department of Corrections' mandatory Equity, Diversity, and Inclusion (EDI) employee training, which he claimed created a discriminatory climate at the workplace. *See* 94 F.4th at 1245. That plaintiff further claimed that "his employer's refusal to investigate or remedy the situation led him to resign from his employment[.]" *Id.* at 1248. He had claimed he was "forced to resign from his position" without offering "specific facts, context, or explanation for why or how he was forced to resign." *Id.* at 1251. He had also failed to allege any details about "how the training related to his actual workplace experience." *Id.* at 1251.

In similar fashion, Plaintiff alleges a race-based hostile work environment created by a senior manager bragging about the diverse and multi-lingual staff, Black directors' friendliness with Black co-workers, Black directors' ignoring White coworkers, and a multi-day EDI seminar where Black employees "made clear" their resentment for White employees. *Second Am. Compl.* [#32], ¶¶ 218-20. Plaintiff asserts an age-based hostile work environment on a vague allegation that OED/HOST "driv[e] off or fir[e] older workers" and "routinely promote[] younger, inexperienced workers over older workers." *Id.* ¶ 31; *see also id*. ¶ 59 (alleging that a program director was "bigoted against older employees," and "terminat[ed]," "manag[ed] out," or "[ran] off" an older employee), ¶ 84 (alleging that

inexperienced employees are "regularly promoted" over older, more experienced workers).

None of these allegations are sufficient. On its face, the DEDO Chief Executive Officer's comment about languages has nothing to do with race—people of all races speak various languages. The allegations about Black directors and White staff and HOST's/DEDO's multi-day EDI seminar are vague and do not allege any specific conduct directed at Plaintiff or "related to [her] actual workplace experience," such as by way of insults or ridicule directed at her because of the multi-day seminar or threatened punishment if she did not attend the seminar. *Young*, 94 F.4th at 1251. Finally, the office's EDI training does not, alone, establish severe or pervasive harassment. *Id.* (noting that the plaintiff "did not allege that the training occurred more than once, that his supervisors threatened to punish or otherwise discipline employees who failed to complete or agree with the materials, or that co-workers engaged in specific acts of insult or ridicule aimed at him because of the training").

Plaintiff's allegations pale in comparison to the allegations asserted in *Lounds*, 812 F.3d 1208, and *Tademy v. Union Pacific Corporation*, 614 F.3d 1132 (10th Cir. 2008), two cases the *Young* court compared and contrasted with the allegations before it. In *Lounds*, the Tenth Circuit reversed a district court's summary judgment award for a defendant employer on a race-based hostile work environment claim. There, the plaintiff had alleged that her direct supervisor made insulting, racialized remarks about her name and directed statements to her filled with race-based stereotypes. *Lounds*, 812 F.3d at 1213. The plaintiff also alleged that she witnessed conversations among her co-workers about lynching of Black people, that a co-worker used the N word in her proximity, that a staff

meeting was laden with references to slavery, and she identified *multiple specific* incidents that made her feel "bombarded with racial slurs and comments." *Id*. at 1213-17. In its decision to reverse and remand, the Tenth Circuit reasoned that a fact finder should decide whether the alleged harassment was pervasive. *Id*. at 1226. Along the way, it drew from precedent which states, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id*. at 1223 (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).

In *Tademy*, the Tenth Circuit also reversed a summary judgment award for a defendant employer. There, the plaintiff had alleged that a subordinate did not communicate with him because the plaintiff is Black, the plaintiff found the N word on his work locker and in a work restroom on more than one occasion, he observed racist cartoons posted at work, the plaintiff's employer failed to take any meaningful disciplinary action when the plaintiff complained of specific incidents, an employee broadly disseminated an email directing all employees to "Keep an eye on the slaves" and copies of the email were posted throughout his employer's facilities, and the plaintiff observed a "life-size hangman's noose" suspended from an industrial clock, which caused him to vomit. 614 F.3d at 1135-38. In its decision to reverse and remand, the Tenth Circuit reasoned that the plaintiff had "alleged a series of acts of harassment, culminating in the life-sized lynching noose, an incident that affected him so profoundly that he did not return to work" at the defendant corporation. *Id*. at 1144 (internal quotations a modifications omitted). The court also reasoned that display of the N word on the plaintiff's locker and in other work locations is "the sort of conduct that would make any reasonable person feel uncomfortable—and entirely unwelcome[.]" *Id*. at 1145.

Plaintiff's allegations are so far removed from the severity or pervasiveness of the conduct alleged in *Lounds* and *Tademy*. They are more akin to the allegations in *Stinnett v. Safeway*, which did not survive summary judgment. There, the Tenth Circuit affirmed a summary judgment award for the employer where a plaintiff based her hostile work environment claim on assertions that "only female employees were required to clean underneath checkstands and serve on-call to remote locations" and "males obtained extra training." 337 F.3d at 1219.

In sum, Plaintiff has not pleaded sufficient facts to show that she endured severe or pervasive harassment in the course of her job. Therefore, her Third Claim (Discrimination and Hostile Work Environment) is **dismissed without prejudice** to the extent she alleges a racially hostile work environment claim. *See, e.g.*, *Gee*, 627 F.3d at 1186.

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#35] is **GRANTED**.

IT IS FURTHER **ORDERED** that Plaintiff's Second Claim (ADEA Retaliation), Third Claim (Race-Based Discrimination and Hostile Work Environment under the Equal Protection Clause, Title VII, § 1981, and CADA), Fourth Claim (Race-Based Retaliation), Fifth Claim (Sex/Gender Discrimination under Title VII and CADA), and Sixth Claim (Sex/Gender Retaliation under Title VII and CADA) are **DISMISSED WITHOUT PREJUDICE**.

IT IS FURTHER **ORDERED** that Plaintiff's First Claim (ADEA Discrimination) may proceed to the extent it is premised on Defendant's alleged failure to promote to the Grant

Compliance Manager position. The First Claim is otherwise **DISMISSED WITHOUT PREJUDICE**.

IT IS FURTHER **ORDERED** that, to the extent Plaintiff alleges an FMLA retaliation claim, it is **DISMISSED WITHOUT PREJUDICE**.

IT IS FURTHER **ORDERED** that Plaintiff's age-, race-, and sex/gender-based claims for discrimination and retaliation are **DISMISSED WITH PREJUDICE** to the extent they are based on any discrete acts that predate January 21, 2022.

Dated: March 29, 2025                              BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge